# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **CINDY SUE MCKEMY,** | ) | |
| Plaintiff | ) | Civil Action No. 1:21cv00004 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of Social** | ) | By:  PAMELA MEADE SARGENT |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

### I. Background and Standard of Review

Plaintiff, Cindy Sue McKemy, ("McKemy"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that McKemy protectively filed her application for DIB[2] on June 26, 2018, alleging disability as of July 20, 2012, based on back problems; chronic obstructive pulmonary disease, ("COPD"); screws in her left foot; and high blood pressure. (Record, ("R."), at 15, 267-68, 297.) The claim was denied initially and upon reconsideration. (R. at 123-25, 128-31.) McKemy then requested a hearing

---

[2] On November 12, 2009, McKemy filed an application for DIB, and on November 20, 2009, she filed an application for supplemental security income, ("SSI"), alleging disability as of April 30, 2009. (R. at 86.) By decision dated July 19, 2012, the ALJ denied McKemy's claims. (R. at 86-99.) There is no indication that McKemy appealed this decision.

In accordance with Social Security Acquiescence Ruling, ("AR"), 00-1(4), "[w]hen adjudicating a subsequent disability claim arising under the same…title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence" and consider its persuasiveness in light of all relevant facts and circumstances. A.R. 00-1(4), 65 Fed. Reg. 1936-01, at *1938, 2000 WL 17162 (Jan. 12, 2000). It is noted that, when *Albright* was decided, the agency "weighed" opinion evidence under different standards. *See Albright v. Comm'r of Soc. Sec. Admin.,* 174 F.3d 473 (4th Cir. 1999). Those standards have been superseded by 20 C.F.R. § 404.1520c, which prescribes how to consider persuasiveness of opinion evidence and prior administrative findings in claims made on or after March 27, 2017. Because this claim was made after March 27, 2017, the ALJ is required to consider prior ALJ decisions and Appeals Council findings under *Albright. See* Program Operations Manual System, ("POMS"), DI 24503.005, available at http://policy.ssa.gov/poms.nsf/lnx/0424503005 (effective Apr. 13, 2021) (explaining the categories of evidence).

The ALJ in this case noted he reviewed the previous 2012 decision and found it to be "partially persuasive." (R. at 25.) The ALJ noted the current record supported a residual functional capacity for light work with occasional postural activities and avoidance of concentrated exposure to pulmonary irritants, noise and hazards. (R. at 25.) Among other things, the ALJ found the evidence no longer supported a restriction to standing and/or walking no more than two hours with no kneeling, crawling or climbing of ladders ropes or scaffolds. (R. at 25.)

before an administrative law judge, ("ALJ"). (R. at 135-36.) The ALJ held a hearing on June 11, 2020, at which McKemy was represented by counsel. (R. at 35-56.)

By decision dated July 1, 2020, the ALJ denied McKemy's claim. (R. at 15-28.) The ALJ found McKemy met the nondisability insured status requirements of the Act for DIB purposes through September 30, 2014.[3] (R. at 17.) The ALJ found McKemy had not engaged in substantial gainful activity from July 20, 2012, the alleged onset date, through September 30, 2014, the date last insured. (R. at 17.) The ALJ determined that, through the date last insured, McKemy had severe impairments, namely lumbar degenerative disc disease; COPD; and migraines, but he found McKemy did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17, 20.)

The ALJ found that, through the date last insured, McKemy had the residual functional capacity to perform light[4] work, except she could perform occasional postural activities, and she should avoid concentrated exposure to pulmonary irritants, noise, such as heavy traffic, and industrial hazards. (R. at 21.) The ALJ found that, through the date last insured, McKemy was able to perform her past relevant work as a medical assistant. (R. at 26.) Alternatively, the ALJ found that, based on McKemy's age, education, work history and residual functional capacity and the testimony of a vocational expert, a significant number of jobs existed in the national economy that McKemy could perform, including the jobs of a sales

---

[3] Therefore, McKemy must show she was disabled between July 20, 2012, the alleged onset date, and September 30, 2014, the date last insured, to be eligible for benefits.

[4] Light work involves lifting items weighing up to 20 pounds with occasional lifting of items weighing up to 10 pounds. If an individual can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2020).

attendant, a cashier II and an office helper. (R. at 26-27, 51-53.) Thus, the ALJ
concluded McKemy was not under a disability as defined by the Act from July 20,
2012, the alleged onset date, through September 30, 2014, the date last insured, and
she was not eligible for DIB benefits. (R. at 27-28.) *See* 20 C.F.R. § 404.1520(f)
(2020).

After the ALJ issued his decision, McKemy pursued her administrative
appeals, (R. at 262-64), but the Appeals Council denied her request for review. (R.
at 1-5.) McKemy then filed this action seeking review of the ALJ's unfavorable
decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §
404.981 (2020). This case is before this court on McKemy's motion for summary
judgment filed June 28, 2021, and the Commissioner's motion for summary
judgment filed July 23, 2021.

## *II. Facts[5]*

McKemy was born in 1964, (R. at 40), which, at the time of the alleged onset
date and the date last insured, classified her as a "younger person" under 20 C.F.R.
§ 404.1563(c). She has a tenth-grade education and training to be a certified nursing
assistant, ("CNA"). (R. at 40, 298.) McKemy has past work as a medical assistant.
(R. at 40, 51, 298.) She testified the most weight she lifted in that job was less than
three pounds. (R. at 41.) McKemy testified she could not work during the relevant
period due to degenerative disc disease, scoliosis, ankle and foot problems, COPD
and anxiety. (R. at 43.) Specifically, she stated she had daily low back pain that

---

[5] Because McKemy does not challenge the ALJ's findings with regard to her mental
impairments, the court will limit its discussion to that evidence relevant to her physical
impairments.

4

radiated into the left leg. (R. at 43-44.) McKemy testified that standing, sitting and walking aggravated her back pain, and she estimated she could be on her feet for 10 minutes at a time, sit for up to 15 minutes at a time and walk for up to 15 feet before having to stop to rest. (R. at 44.) She estimated she could lift and carry no more than five pounds. (R. at 44-45.) McKemy testified she saw a pain specialist during the relevant period, who prescribed pain medication and administered a series of spinal steroid injections for her back pain. (R. at 45.) She said these injections helped the first couple of days before the pain would return. (R. at 45.) In addition to medication and injections, McKemy testified she would lie on her back on a heating pad to help with her pain, and she tried to do back exercises, but she was unable to lie on the floor. (R. at 45-46.) She stated she had to lie down for six to seven hours daily. (R. at 46.) McKemy further stated her COPD during the relevant period made her very tired during the day, resulting in an inability to think straight. (R. at 46.) She said she was on oxygen therapy at night, she used inhalers, and she used a nebulizer about three times weekly. (R. at 46-47.) McKemy testified her breathing issues during the relevant period included feeling like she was smothering, which resulted in her becoming "real nervous." (R. at 47.) She stated her husband did all the housework during the relevant time. (R. at 49.) McKemy testified she did not go anywhere socially or for fun, but her youngest son would sometimes visit her, which she enjoyed. (R. at 49.)

William Houston Reed, a vocational expert, also was present and testified at McKemy's hearing. (R. at 50-55.) He classified McKemy's past work as a medical assistant as light and skilled. (R. at 51.) Reed testified that a hypothetical individual of McKemy's age, education and work experience, who could perform light work, with occasional postural activities, and which did not require concentrated exposure to pulmonary irritants, loud noise, such as heavy traffic, and industrial hazards, could

perform McKemy's past work as a medical assistant. (R. at 51-52.) Additionally, Reed testified there were other jobs existing in significant numbers in the national economy such an individual could perform, including those of a sales attendant, a cashier II and an office helper. (R. at 52-53.) Reed also was asked to consider the same hypothetical individual, but who could not stand and/or walk more than two hours in an eight-hour workday. (R. at 53.) He testified such an individual could not perform McKemy's past work, but still could perform the office helper job previously identified. (R. at 53.) Reed testified that off-task behavior is tolerated on a scale ranging between more than 10 percent, but below 20 percent, depending on the job. (R. at 54.) Specifically, he testified McKemy's past work as a medical assistant, as well as the sales attendant and cashier II jobs, would be near the lower end of the scale, while the office helper job would be near the mid to upper end of the scale. (R. at 54.) He stated that, if a hypothetical individual had to lie down during the day, all jobs he listed would be eliminated. (R. at 54.) Lastly, Reed testified the office helper job would accommodate a sit/stand option every 15 minutes. (R. at 54.)

In rendering his decision, the ALJ reviewed records from Dr. Bert Spetzler, M.D., a state agency physician; Dr. Jack Hutcheson, M.D., a state agency physician; Richard Luck, Ph.D., a state agency psychologist; Palmetto Imaging; Columbia Heart, P.A.; Dr. C. David Perry, M.D.; Lexington Family Practice, L.L.C.; Dr. Peter T. Rock, M.D.; Abingdon Internal Medicine, PC; Catawba Valley Medical Center; Bristol Regional Medical Center; Wellmont Medical Associates; Holston Valley Medical Center; Wellmont Medical Associates – Pulmonary; Palmetto Pain Management; Hickory Family Practice; Catawba Valley Pulmonology; and Catawba Family Medical Group.

Dr. C. David Perry, M.D., wrote a letter, dated February 16, 2012, stating he had treated McKemy for severe obstructive lung disease since February 2011. (R. at 360.) Dr. Perry stated McKemy was concerned about possible environmental irritants that might be worsening her underlying lung disease. (R. at 360.) He stated that anyone with underlying COPD was more susceptible to the effects of any environmental respiratory irritant. (R. at 360.)

On April 6, 2012, McKemy saw Amy J. Clark, F.N.P.-B.C., a board-certified family nurse practitioner at Palmetto Pain Management, to resume care[6] after having moved temporarily and being gone for several months. (R. at 623.) Clark noted McKemy's history of lumbosacral radicular syndrome and neural foraminal stenosis at the L4-L5 and L5-S1 levels. (R. at 623.) She also noted McKemy was a candidate for radiofrequency rhizotomy,[7] but McKemy wished to proceed with medication management due to financial concerns. (R. at 623.) Clark noted that McKemy had continued her previous medication regimen of Percocet and Flexeril, on which she continued to do reasonably well. (R. at 623.) McKemy reported her back seemed a little bit worse due to driving to the appointment, and she rated her pain, located in the left lower back, a six on a 10-point scale. (R. at 623.) On examination, she was alert, oriented and in no acute distress; lungs were clear, bilaterally; she had a reasonably full range of motion of the lumbar spine in all planes, but she was not tested to the extreme; and her gait was nonantalgic. (R. at 623.) Clark diagnosed left

---

[6] McKemy initially began treatment with Palmetto Pain Management in January 2011. (R. at 622.)

[7] A radiofrequency rhizotomy, also called a radiofrequency ablation, uses heat to destroy tissue. For pain management, radio waves are sent through a precisely placed needle to heat an area of the nerve in order to prevent pain signals from being sent back to the brain. *See* my.clevelandclinic.org/health/treatments/17411-radiofrequency-ablation (last visited May 13, 2022).

lumbosacral radicular syndrome; neural foraminal stenosis at the L4-L5 and L5-S1 levels; chronic left-sided low back and leg pain; and near complete short-term relief following transforaminal blocks. (R. at 623.) She recommended repeat interventional treatment, but to continue with medications in the meantime, and she refilled McKemy's Percocet and Flexeril. (R. at 623.) On May 14, 2012, Dr. Ezra B. Riber, M.D., noted McKemy most recently underwent transforaminal blocks in October 2011, which provided remarkably good relief. (R. at 622.) However, he also noted the results of a July 2011 radiofrequency rhizotomy were disappointing. (R. at 622.) Dr. Riber noted McKemy used oxygen at times. (R. at 622.) Her examination was the same, except Dr. Riber did not assess McKemy's lungs, and he noted increased pain with forward flexion and extension. (R. at 622.) No changes were made to McKemy's diagnoses or pain medications, and Dr. Riber noted he would consider repeat transforaminal blocks, as well as one additional radiofrequency rhizotomy, once McKemy obtained insurance. (R. at 622.) On June 13, 2012, McKemy rated her pain as a four on a 10-point scale, and she reported her pain medications were doing well. (R. at 621.) Dr. Riber noted McKemy was awaiting repeat transforaminal blocks, as well as a radiofrequency rhizotomy, pending the resolution of some insurance issues. (R. at 621.) On examination, she was alert, fully oriented and in no acute distress; speech and content were appropriate; she was a good historian; lungs were clear, bilaterally; range of motion of the lumbar spine was reasonably full; and she had no limp or foot drop. (R. at 621.) McKemy's diagnoses remained the same, and her pain medication regimen was continued. (R. at 621.)

On June 13, 2012, McKemy saw Robert Christensen, P.A.-C, a certified physician assistant at Lexington Family Practice. (R. at 73.) She was well-appearing and in no distress; vital signs were stable; she had a regular heart rate and rhythm;

and lungs were clear, bilaterally. (R. at 73.) Christensen diagnosed COPD, and he gave McKemy samples of Symbicort. (R. at 73.)

McKemy established care with Dr. Peter T. Rock, M.D., on October 18, 2012, after moving from South Carolina. (R. at 374.) She reported long-standing back problems, stating she had undergone a rhizotomy in July 2011, and she also reported hypertension and breathing problems. (R. at 374.) McKemy reported smoking half a pack of cigarettes daily for the last 20 years, and she stated she performed light exercise. (R. at 374-75.) She indicated she was taking, among other things, Albuterol, Flexeril, oxycodone-acetaminophen, Spiriva and Symbicort. (R. at 374.) On examination, she was alert and oriented, with mild wheezing, bilaterally; she had symmetric extremities without edema; tenderness in the low back; and negative straight leg raise testing. (R. at 374-75.) Dr. Rock diagnosed degenerative disc disease; arthritis of the spine; radiculopathy; ankylosing spondylosis; and probable COPD. (R. at 375.) He continued McKemy's medications, except he changed her pain medication to Lortab. (R. at 375.) On November 15, 2012, McKemy reported having injured her left foot. (R. at 372.) On examination, she was alert and oriented; lungs were clear; there was slight bruising on the fourth toe of the left foot, but no evidence of fracture; she had tenderness in the lumbar area; and straight leg raise testing remained negative. (R. at 372-73.) Dr. Rock added contusion of the foot to McKemy's diagnoses, and he continued her medications. (R. at 373.) On December 14, 2012, McKemy noted her breathing was fairly stable, but she continued to have low back pain. (R. at 370.) She was alert and oriented; lungs were fairly clear with no wheezing; she was a little tender in the lumbosacral spine; straight leg raise testing was negative in the sitting position; and reflexes were normal. (R. at 370-71.) McKemy's diagnoses remained unchanged, and Dr. Rock continued her medications. (R. at 371.) On January 8, 2013, she complained of a productive cough

and a right earache for the previous five days. (R. at 368.) McKemy reported continued low back and joint pain. (R. at 368.) On examination, she was alert and oriented; lungs were clear; and she had low back tenderness. (R. at 368-69.) Dr. Rock added sinusitis and bronchitis to McKemy's diagnoses, he prescribed Keflex, and he continued her other medications. (R. at 369.)

When McKemy returned to Dr. Rock on February 7, 2013, she reported fairly stable breathing, but she continued to have pain, mainly in her lower back, but also in her hands. (R. at 366-67.) She was alert and oriented; lungs were clear, without wheezing or rhonchi; there was tenderness in the lumbosacral spine; straight leg raise testing was negative in the sitting position; and reflexes were normal. (R. at 366-67.) Dr. Rock's diagnoses remained unchanged, he continued McKemy's medications, and he ordered hand x-rays. (R. at 367.) On March 8, 2013, McKemy complained of a dry, hacking cough and a runny nose. (R. at 364.) Her breathing was, again, described as fairly stable, but she continued to have low back pain. (R. at 364.) McKemy was alert and oriented with clear lungs, but slightly diminished breath sounds, bilaterally; she had low back and extremity tenderness; and reflexes were normal. (R. at 364.) Dr. Rock continued her medications, and he encouraged smoking cessation. (R. at 365.) On April 8, 2013, McKemy reported blood pressure issues and continued pain. (R. at 362.) She was alert and oriented; lungs were clear, without wheezing or rhonchi; and she was a little tender in the low back area and with range of motion of the lower extremities. (R. at 362-63.) Dr. Rock continued McKemy's medications. (R. at 363.) On May 7, 2013, McKemy reported a mostly nonproductive cough for the previous month. (R. at 377.) However, Dr. Rock noted McKemy's approximately 30-year smoking history. (R. at 377.) On examination, she was alert and oriented, and her lungs were clear, without wheezing or rhonchi. (R. at 378.) Dr. Rock diagnosed acute bronchitis and he continued McKemy's

medications, encouraged smoking cessation and advised her to try Claritin. (R. at 378.) On May 29, 2013, McKemy complained of increased low back pain. (R. at 678.) On examination, she was alert and oriented; she had a few wheezes, bilaterally; she had tenderness in the low back; and reflexes were 1+ and symmetric. (R. at 678.) Dr. Rock noted McKemy's last drug screen was positive for morphine and codeine, for which he had no explanation. (R. at 678.) He refilled her medications, except for her pain medication. (R. at 678.)

McKemy presented to Hickory Family Practice on September 19, 2013, to establish care. (R. at 644.) She reported having recently moved there from Kentucky. (R. at 644.) McKemy reported some increased stress that was elevating her blood pressure. (R. at 644.) She denied shortness of breath. (R. at 644.) It was noted McKemy was a stay-at-home mom with two sons, one of whom had panic attacks and agoraphobia with attention deficit hyperactivity disorder, ("ADHD"), and the other had autism with Type I brittle diabetes. (R. at 644.) She reported smoking about one-half pack of cigarettes daily since age 16. (R. at 644.) On examination, McKemy was alert, oriented and in no acute distress; she had a full range of motion; lungs were clear, bilaterally, without wheezing, rales or rhonchi; and her gait was steady without deficits. (R. at 644.) She was diagnosed with hypertension with a stress component, as well as migraines. (R. at 643.) McKemy was prescribed Lisinopril, Imitrex and Phenergan. (R. at 643.)

On September 23, 2013, McKemy returned to Palmetto Pain Management after having moved away to Kentucky for approximately one year. (R. at 618.) She complained of low back pain, left leg pain and left foot pain, noting her foot pain began after suffering a first metatarsal fracture in 2005. (R. at 618.) Mike Robichaud, P.A.-C, a certified physician assistant, noted McKemy was being treated with Lortab

while in Kentucky. (R. at 618.) She rated her pain as a four on a 10-point scale at that time. (R. at 618.) McKemy advised she continued to smoke half a pack of cigarettes daily. (R. at 619.) Examination revealed positive straight leg raise testing on the left, but negative on the right; no atrophic or dystrophic changes; an ability to stand on her heels and toes without difficulty; full strength in both legs; a left limp; clear lungs, bilaterally, without wheezes, rales or rhonchi; and she was fully oriented and in no apparent distress. (R. at 619.) McKemy was diagnosed with lumbago and chronic pain syndrome, and Robichaud discontinued Lortab and prescribed Opana and Flexeril. (R. at 619.) When she returned on October 21, 2013, she was in no acute distress; she exhibited no pain behavior; her lungs were clear, with no wheezes, rales or rhonchi; and gait was nonantalgic. (R. at 617.) Dr. Riber added thoracic or lumbosacral neuritis or radiculitis, not otherwise specified; limb pain; and other back symptoms to McKemy's diagnoses, he discontinued Opana, and he prescribed Exalgo and Percocet. (R. at 617.)

On October 22, 2013, McKemy returned to Hickory Family Practice, with complaints of a lesion under her arm, and she reported she had a history of excision of lesions and lymph nodes under her right arm. (R. at 643.) McKemy, again, denied shortness of breath, but the treating provider noted a history of COPD without spirometry testing. (R. at 643.) She was alert, oriented and in no acute distress; she had a full range of motion; lungs were clear, bilaterally; cranial nerves were grossly intact; and she had a steady gait without deficits. (R. at 643.) A right axillary examination revealed a subcentimeter, mobile lesion of the anterolateral aspect of the axilla, which was slightly tender to palpation. (R. at 643.) Dr. Katherine Hemby, M.D., diagnosed hypertension; right axillary lesion; and COPD, and she scheduled spirometry testing and an ultrasound of the right axilla area. (R. at 643.) However,

when McKemy was contacted to schedule the ultrasound, she stated she wished to wait until after January 2014, as this is when her insurance was changing. (R. at 643.)

When McKemy returned to Palmetto Pain Management on November 4, 2013, she reported gastrointestinal side effects from Exalgo and noted she was taking one Percocet daily for breakthrough pain. (R. at 613.) She rated her pain a three on a 10-point scale. (R. at 613.) On examination, McKemy was pleasant, cooperative, alert and fully oriented, with appropriate speech and content; she exhibited no pain behavior; she had clear lungs, without wheezes, rales or rhonchi; and she had a nonaltalgic gait. (R. at 614.) Robichaud's diagnoses remained unchanged, but he discontinued Exalgo, continued Percocet and prescribed a Duragesic patch. (R. at 614.)

When McKemy returned to Dr. Hemby on January 13, 2014, she complained of a headache and sinus symptoms, and she reported she had cut back on her smoking. (R. at 642.) On examination, she was alert and oriented, but mildly ill-appearing; she had diffuse sinus tenderness; full range of motion; clear lungs, bilaterally; and a grossly intact neurological examination, including a steady gait without deficits. (R. at 642.) Dr. Hemby diagnosed sinusitis, for which she prescribed a Z-Pak. (R. at 642.) On January 28, 2014, McKemy called, stating her earache had returned, and she requested an antibiotic. (R. at 642.) She stated she was with her mother, who had been in ICU for a week. (R. at 642.) Dr. Hemby prescribed Amoxil. (R. at 642.) When McKemy returned to Dr. Hemby on February 12, 2014, she reported continuing to care for her mother, who had recently been ill. (R. at 641.) She described her COPD as "well-controlled" with the rare use of her Albuterol inhaler, Symbicort and occasional use of Spiriva. (R. at 641.) McKemy reported not having a migraine headache since she returned to Palmetto Pain Management in

September 2013. (R. at 641.) She stated she continued to smoke a half-pack of cigarettes daily, but was trying to switch to using electronic cigarettes. (R. at 641.) McKemy reported well-controlled hypertension when she took her medication and controlled back and foot pain with occasional Lortab. (R. at 641.) On examination, McKemy was alert and oriented; she had full range of motion; lungs were clear, bilaterally, without wheezes, rales or rhonchi; cranial nerves were intact; biceps, triceps, brachioradialis, patellar and Achilles tendon reflexes were symmetrical, bilaterally; gait was steady without deficits; and there was no ecchymosis, clubbing, cyanosis or edema of the extremities. (R. at 640.) Dr. Hemby diagnosed, among other things, hypertension with medication noncompliance; COPD; well-controlled chronic pain; and migraines. (R. at 640.) She scheduled spirometry testing, continued McKemy's medications and discussed the importance of medication compliance. (R. at 640.) McKemy did not show for her February 25, 2014, spirometry testing. (R. at 640.)

On March 19, 2014, McKemy reported being sick for a week with "the crud," as well as having leg, hip and back pain that was not her usual pain. (R. at 639.) Specifically, she reported some pain in her left inner thigh, stating she had fallen off a ladder about two months previously, but did not know if this was related. (R. at 639.) McKemy stated the pain shot down to her knee, and her hip bothered her sometimes, as well. (R. at 639.) She rated her current pain level as a seven out of 10, worse with sitting and helped by heat. (R. at 639.) McKemy denied loss of range of motion in the leg, and she stated movement typically did not trigger the pain. (R. at 639.) She denied shortness of breath. (R. at 639.) On examination, McKemy was alert and oriented; she had a full range of motion; lungs were clear, bilaterally, without wheezes, rales or rhonchi; she had a full range of motion at the hip and no point tenderness in the inner left thigh or hip; no pain was elicited with abduction,

adduction, inversion or eversion of the hip; cranial nerves were grossly intact; and she had a steady gait without deficits. (R. at 639.) Dr. Hemby diagnosed rhinitis and left inner thigh pain. (R. at 639.) Spirometry testing was rescheduled, but McKemy canceled due to illness. (R. at 639.) When McKemy returned on May 13, 2014, she reported gastroesophageal reflux disease, ("GERD"). (R. at 638.) She reported continuing to help care for her sick mother, as well as a mentally handicapped and autistic son. (R. at 638.) A few days previously, she had a migraine while out of town, but she did not have any medication with her. (R. at 638.) McKemy stated she had taken medication for GERD in the past, and she requested to restart Protonix. (R. at 638.) She denied any shortness of breath. (R. at 638.) On examination, McKemy was alert, oriented and in no acute distress; lungs were clear, bilaterally, without wheezes, rales or rhonchi; there was no ecchymosis, cyanosis, clubbing or edema of the extremities; cranial nerves were grossly intact; and gait was steady without deficits. (R. at 638.) Dr. Hemby diagnosed, among other things, COPD; hypertension, controlled when on medications; migraines; and GERD. (R. at 638.) She advised McKemy to keep migraine medication with her when she traveled. (R. at 638.) Spirometry testing, from this same date, showed a severe obstruction, and McKemy's lung age was assessed as 91. (R. at 645-46.) She was advised to continue her current medications. (R. at 645.) McKemy called Dr. Hemby's office on June 19, 2014, stating Imitrex was not helping her migraines. (R. at 637.) She said Excedrin helped, but the headaches seemed to come back worse. (R. at 637.)

On August 28, 2018, in connection with the initial determination of McKemy's claim, Dr. Bert Spetzler, M.D., a state agency physician, completed a medical evaluation, finding that, while McKemy had degenerative changes in the lumbar spine, there were no physical examinations from July 20, 2012, the alleged onset date, through September 30, 2014, the date last insured. (R. at 108.) That being

the case, Dr. Spetzler concluded there was insufficient evidence before McKemy's date last insured to fully and accurately adjudicate her claim. (R. at 108.) Likewise, on November 14, 2018, in connection with the reconsideration of McKemy's claim, Dr. Jack Hutcheson, M.D., a state agency physician, completed another medical evaluation, finding that, while McKemy had degenerative changes in the lumbar spine and COPD, physical examinations were insufficient to evaluate her level of functioning prior to her date last insured. (R. at 117.) That being the case, Dr. Hutcheson concluded there was insufficient evidence to determine the severity of McKemy's impairments prior to the date last insured. (R. at 117.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2020). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age,

education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

McKemy argues the ALJ erred by improperly considering the prior ALJ's decision. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 7-11.) Specifically, McKemy argues substantial evidence does not support a finding that her lumbar spine and respiratory impairments improved after the July 2012 decision. (Plaintiff's Brief at 7-10.) McKemy also argues, if the ALJ properly applied the residual functional capacity finding from the prior ALJ's decision, a borderline age situation might have existed, which could have directed a finding of disabled under the Medical-Vocational Guidelines, found at 20 C.F.R. Part 404, Subpart P, Appendix 2, ("the Grids"). (Plaintiff's Brief at 10-11.)

Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. § 404.1520c(a) (2020) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[8]

Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5) (2020) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings

---

[8] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2) (2020). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 404.1513(a)(5) (2020).

"together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2020).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or prior administrative medical findings. 20 C.F.R. § 404.1520c(b)(2) (2020).[9] In evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. § 404.1520c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. § 404.1520c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. § 404.1520c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he considered each of them. Instead, when articulating his finding about whether an opinion is persuasive, the ALJ need only explain how he considered "the most important factors" of supportability and consistency. *See* 20 C.F.R. § 404.1520c(b)(2). The ALJ may comment on the other factors, including the source's

---

[9] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2).

relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. § 404.1520c(b)(2)-(3) (2020).

When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly the same, the ALJ must consider the most persuasive factors, including the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(b)(3), (c)(3)-(5).

McKemy argues the ALJ erred by improperly considering the prior ALJ's decision and finding her lumbar spine and respiratory impairments improved, so as to reject the prior finding that she had a residual functional capacity for a reduced range of light work, including standing and/or walking no more than two hours in an eight-hour workday. The prior ALJ also found McKemy could not kneel, crawl or climb ladders, ropes or scaffolds; she could have no exposure to concentrated dust, fumes, gases, odors or to hazards, such as heights or dangerous machinery; and she could not stoop, crouch, climb ramps or stairs or operate foot controls with the left foot more than occasionally. (R. at 93.) Given this residual functional capacity, the prior ALJ identified sedentary[10] jobs McKemy could perform, including her past work as an office medical clerk. (R. at 97-98.) A claimant's residual functional capacity refers to the most the claimant can still do despite her limitations. *See* 20

---

[10] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying items like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing often is necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2020).

C.F.R. § 404.1545(a) (2020). The current ALJ found that, through the date last insured, McKemy had the residual functional capacity to perform light work that required the performance of no more than occasional postural activities, and she should avoid concentrated exposure to pulmonary irritants, noise, such as heavy traffic, and industrial hazards. (R. at 21.)

Acquiescence Ruling 00-1(4), directs an ALJ to "consider such a prior [ALJ] finding as evidence and give it appropriate weight in light of all relevant facts and circumstances" in a claimant's subsequent case.[11] 2000 WL 43774, at *4 (Jan. 12, 2000). Specifically, the ALJ must consider the following:

(1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition;

(2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim; and

(3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim.

AR 00-1(4), 2000 WL 43774, at *4. As the Commissioner states in her brief, the ALJ is not required to "walk through each factor" in order to comply with AR 00-1(4). *Cuffee v. Berryhill*, 680 F. App'x 156, 159 (4th Cir. 2017) (quoting *Grant v. Colvin*, 2014 WL 852080, at *7 (E.D. Va. Mar. 4, 2014)). Instead, such compliance is achieved by "reviewing and evaluating all the evidence presented at the correct

---

[11] Given that McKemy's claim was filed after March 27, 2017, the new regulations apply, and, as the ALJ correctly stated in his decision, the appropriate inquiry is persuasiveness, not weight. (R. at 25.)

standard." *Cuffee*, 680 F. App'x at 159 (quoting *Grant*, 2014 WL 852080, at *7). Here, citing to AR 00-1(4), the ALJ considered the prior ALJ's residual functional capacity finding, limiting McKemy, among other things, to standing and/or walking no more than two hours in an eight-hour workday with no kneeling, crawling or climbing of ladders, ropes or scaffolds. (R. at 25.) However, the ALJ found the prior decision "partially persuasive," explaining that the findings were not supported by the current record, which showed that McKemy's "complaints and treatment did not continue at the level that existed during the period prior to her previous decision." (R. at 25.) In particular, with regard to her back impairment, the ALJ correctly noted that, although McKemy had some abnormal examination findings regarding positive straight leg raise testing and a limp in September 2013, other examinations consistently reflected a normal, steady gait, normal strength and normal range of motion, with the only abnormality being lumbar tenderness. (R. at 25.) The ALJ further noted that McKemy's sole treatment during the current period of review consisted of medication management. (R. at 25.) Although additional transforaminal blocks and a radiofrequency rhizotomy were discussed, neither of these procedures was performed during the relevant time.

Additionally, the court notes that McKemy reported, and the record reflects, pain relief with the use of medication. For instance, in February 2014, she reported that occasional Lortab controlled her back pain, and Dr. Hemby diagnosed, among other things, well-controlled chronic pain at this visit. (R. at 640-41.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). In addition to this evidence, the court further notes that McKemy reported helping to care for her ill mother, as well as two sons with mental and/or physical health challenges. The ALJ concluded that such evidence did not support a restriction to standing and/or walking no more than

two hours with no kneeling, crawling or climbing of ladders, ropes or scaffolds, as found by the prior ALJ. (R. at 25.)

Regarding her respiratory impairment, the ALJ noted that McKemy had a few wheezes, and, although pulmonary function testing indicated severe obstruction, she frequently had normal pulmonary findings. (R. at 24.) For instance, in October 2012, she had mild wheezing, bilaterally; in March 2013, she had slightly diminished breath sounds, bilaterally, despite having clear lungs; and in May 2013, she had a few wheezes, bilaterally. (R. at 364, 375, 679.) Moreover, at one of these visits, she complained of sinus symptoms. (R. at 364.) Otherwise, McKemy consistently exhibited clear lungs with no wheezing, rales or rhonchi, and she described her breathing as fairly stable. The court notes that, despite the finding of severe obstruction, McKemy's medication regimen was not modified. The ALJ further noted that the evidence showed McKemy's COPD was controlled on an outpatient basis with medication management from her primary care provider during the relevant period, and she did not require emergency room treatment or any inpatient hospitalization. (R. at 24.) For example, in February 2014, McKemy advised Dr. Hemby her COPD was well-controlled with rare use of an Albuterol inhaler, Symbicort and occasional use of Spiriva. (R. at 641.) *See Gross*, 785 F.2d at 1166. The court also notes that McKemy admitted to smoking a half-pack of cigarettes daily for nearly 30 years in 2013, and she was advised on multiple occasions to quit smoking. Lastly, despite testifying that she was on oxygen at night during the relevant time, the relevant treatment notes do not reflect that she was prescribed oxygen therapy. All of this being the case, the ALJ concluded that a restriction to light work with the occasional performance of postural activities and the avoidance of concentrated exposure to pulmonary irritants accommodated her breathing impairment. (R. at 24.)

For the above-stated reasons, I find that the ALJ considered the factors outlined in AR 00-1(4), and his determination that the 2012 decision is partially persuasive is supported by substantial evidence. I, likewise, find his deviation from the prior residual functional capacity finding also is supported by substantial evidence, as is his ultimate residual functional capacity finding. It is important to note that the evidence of record for the relevant time period – July 20, 2012, through September 30, 2014 – does not contain any medical provider opinion limiting McKemy's work activities in any way. Given these findings, I will not address McKemy's remaining argument.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's consideration of the prior ALJ's decision;

2. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3. Substantial evidence exists in the record to support the Commissioner's finding that McKemy was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny McKemy's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     May 16, 2022.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE